All rise. This is the Illinois Comfort Service Individuals' Balance Session. This is Michael B. Hyman presiding. Please be quiet and be seated. Good morning. My name is Justice Michael Hyman, and to your right is Justice Pachisky, and to your left is Justice Mason. On behalf of the 3rd Division of the Illinois Appellate Court, I want to tell you how honored we are to be here and to present to you an actual argument. Today, as you know, is Law Day, May 1st. I think it makes it very appropriate that we are here. Law Day is not like Memorial Day or July 4th. It's not a celebration. It's an observance. And what we observe is the rule of law, which protects our rights, our liberties, and our property. Without the rule of law, all of us could easily become hostage to the whims of those who have power and to the ancient maxim that might makes right. If you remember nothing else from today, I hope you remember this. There can be no rule of law unless there is also an independent judiciary. An independent judiciary which is freely, fully, and impartially the administrator of the law. What we observe today is what you observe today. Judges as impartial guardians of the rule of law, and excellent lawyers arguing on behalf of their clients for their positions. To begin, I would ask the clerk to call the case that's before us this morning. 12-1169, People v. Brandon-Starks. Will the attorneys that will be presenting the argument please approach the podium. Please each introduce yourselves. Good morning, Your Honors. My name is Pamela Rubio with the State Appellate Defender's Office on behalf of Brandon-Starks. Assistant State Attorney Tasha Marie Kelly on behalf of the People. Thank you. Normally there's about a half hour argument, but today we thought we would, about 25 minutes each side with a rebuttal of about five minutes, if that's acceptable. May it please the court. This morning I will be focusing on issues two and four from Brandon-Starks' briefs, but I'm prepared to answer questions about any of the issues contained in the brief. According to the State's evidence in Brandon-Starks' trial, this Glock .45 caliber pistol was the sole weapon connected to Robert Schein's murder. Yet the State introduced evidence of these wholly irrelevant weapons, extended clips, and ammunition completely unconnected to the crime. The State's gratuitous use of this evidence through witness testimony, the use of multiple photographs, and reference to it during closing argument was highly prejudicial to Brandon-Starks and created reversible error. Weapons evidence may be admitted at trials only where there is proof to connect the weapon to the crime itself and to the defendant. In this case, no such connection existed. The State's ballistics evidence established that the Glock .45 was the only weapon involved in this crime. No testimony was ever introduced that any other weapon was seen by any witnesses during the court, that more than one weapon was seen during the course of the incident, and no physical evidence suggested that any kind of shell casings or other firearms evidence was recovered from the scene. And the State, again, itself affirmatively argued that, in closing, that the one weapon was the murder weapon. The only reason the additional firearms evidence came in at all was because it was found in the apartment in which the murder weapon was found. But that fact is not connected in any way to Brandon-Starks' arrest. It's not a detail of his arrest. He was arrested outside of the apartment building altogether and was never seen in or connected to the apartment in which the weapons were recovered. Was there an objection to the evidence at trial? Well, there was a motion in Limine that was filed prior to trial that asked to bar reference to, quote-unquote, other investigations and alleged crimes. And there was a discussion on the record about the motion in Limine and what it covered. And the trial court stated on the record that there was another murder investigation at issue, and the State agreed not to introduce other crimes evidence. The firearms were not explicitly mentioned in the motion, but we contend that the motion in Limine did preserve this issue. If it didn't, then certainly this would constitute ineffective assistance of counsel for not explicitly stating that the firearms evidence should have been excluded. What about the plain error? Plain error also applies under both prompts. Why is this – if plain error applies, then why is this evidence closely balanced? The evidence presented – well, the evidence was closely balanced for several reasons. First, it's important to keep in mind that Brandon-Starks and Robert Schein were in no way connected with one another. The State presented no motive evidence and no ties between the two individuals. The facts of the circumstances are that the only way the police even came up with Brandon-Starks' name was three days after the shooting, the mother of the victim received an anonymous voicemail message that the police never traced, stating that a person with the defendant's nickname committed the crime. Two months later, in an unrelated raid on the apartment, the police apprehended Brandon-Starks. The eyewitness testimony that was presented was far from convincing. The three eyewitnesses had a very limited opportunity to see the shooting. Standing and hunched down behind vehicles in a parking lot across the street, they all admitted that it was only a few seconds worth. Mr. Draper said he was hunched down beside his vehicle, but I don't think Ms. Howard said she was. That's correct. Ms. Howard said that she froze. But she said everything happened so fast and she was stunned, and all of those descriptions of her mental process goes to her opportunity to observe what she was observing. One out of the three eyewitnesses could not identify Brandon-Starks in a photo array, and one other of the three could not initially identify him in the lineup. They also weren't able to provide any detailed description of the shooter, other than to say it was a young black man with dreadlocks. No physical description. And the defense is also alleging that the photo array and the lineups were suggested. Is that correct? Yes. We did not raise a separate argument for the exclusion of that on appeal, but the composition of the array and the lineup were suggested in the appearance of the participants. Mr. Starks was the only one wearing a hat that made his dreadlocks appear puffier, and the fact that the defendant was more identifiable out of both lineups and arrays for the witnesses to identify. The only other evidence that the state presented was wholly immaterial DNA evidence that was recovered from the weapon, and the state's own expert testified that there could be three and up to over 100 contributors to this mixture of DNA found on the murder weapon. So our contention is that that evidence was extremely weak, did not really contribute to the state's case against Brandon-Starks at all. Another thing to keep in mind is that with the erroneous admission of other crimes evidence, the record, the erroneous admission of other crimes evidence requires reversal unless the record can affirmatively show that no prejudice resulted. In addition to the evidence being closely balanced in this case, this court and our Supreme Court has acknowledged that weapons evidence itself in general is highly prejudicial, and that's because a jury may see these weapons and convict because they think that the defendant is a bad person, as a person that has a propensity to commit crimes, and in particular with firearms evidence, murders. In this case, these guns were highly particularly prejudicial given not only their intimidating appearance, but the quantity and the menacing look of them. There's a machine gun type gun that looks extremely menacing, looks like a maniacal hit man might have been possessing these weapons, and yet the defendant was in no way connected to these weapons. The weapons were recovered by the police two months after the actual shooting? Correct. During a raid of an apartment building, not connected at all to the offense in question. They were actually looking for somebody completely different, related to a completely different offense. And Mr. Starks, they saw running out of the apartment building, but never connected him to the apartment itself. Was there any testimony that he had been in that apartment? No testimony that he had ever been in that apartment or connected to that apartment as a resident or a friend of a resident. No connection whatsoever to that apartment, just the building itself. In the closing argument, the state said something about the gun and the clip, the large clip. Was there any testimony of any witness about seeing a gun with a large clip? No, the only witness who actually described the weapon at all was, I believe, Ronald Draper, who said that it was a large black revolver. He said it might have been an automatic or a 9mm, but he wasn't certain. He did not mention any kind of extended clip. There's no evidence that an extended clip was actually used. And the state actually used this evidence, as Your Honor mentioned in closing argument, to argue that this quote-unquote stash of weapons goes to prove Brandon Starks' intent to kill, because an essential element of the offense. Mentioning that a single cartridge of bullets was not enough for him. He needed more clips, he needed more ammunition. Clearly the state utilized this inappropriately entered other crimes evidence to help bolster its case against the defendant. Didn't the judge also say something about this evidence? Yes, during the sentencing hearing, this evidence obviously had an impression on anyone who saw the evidence. The court said that Mr. Starks looked like a menace, something of a mass murderer, shooting people indiscriminately on the street. Obviously, and he also mentioned that he was in possession of something of a fearful looking arsenal of guns. Clearly this evidence was impactful to anybody who saw it at the trial. And for that reason, because the record doesn't prove that no prejudice resulted, reversal of Mr. Starks' conviction is warranted in this case. Moving on to Mr. Starks' Sixth Amendment right to counsel argument. In this case, instead of obtaining an arrest warrant, the police issued an investigative alert for arrest, and then conducted three lineups without Mr. Starks' right to counsel. Because adversarial judicial proceedings had commenced through the issuance of the investigative alert for arrest, Mr. Starks' Sixth Amendment right to counsel was violated when those lineups were conducted without him being provided the right to counsel. Did he ask for counsel? He did not, but this is a case, unlike Fifth Amendment right to counsel, Sixth Amendment right to counsel becomes operative when adversarial judicial proceedings commence, so he does not have to expressly request counsel. Is there any Illinois Supreme Court case that says the Sixth Amendment right to counsel attaches upon the issuance of an arrest warrant? Not yet, but the court has been presented with a few opportunities to address that issue, and has expressly refused to rule on that issue. Well, one of them was People v. White. Correct. And the First District, where we sit, has held that the issuance of an arrest warrant does not trigger a Sixth Amendment right to counsel. Right, and the court acknowledged the argument and then expressly said, we're not ruling on this issue, we will leave it open, and ruled on a harmlessness analysis in that case. The same occurred in People v. Curtis, a prior case to White, and in that case, the appellate court did find that an arrest warrant triggers adversarial judicial proceedings, and the Supreme Court was given the opportunity to address that ruling and decide, and it just said, assuming that that is correct, we find the error harmless anyway. So they have, I would say, intentionally left the question open. I'm sorry, go ahead. No, go ahead. The defendant's position is that once the investigative alert issued, the right to counsel attached. Correct. Okay. And that is because, like the issuance of an arrest warrant, an investigative alert for arrest is a formal proceeding, even though it's conducted by the police department. As this court noted, an investigative alert for arrest is essentially the same as adding an arrest warrant, but without the constitutional protections. There actually was a warrant issued, an arrest warrant issued, against this defendant, but it was after he was already in custody, is that correct? Yes, I believe so. After the photo arrays were conducted in this case. Do you remember if that was after the third lineup or before the third lineup? I believe a complaint was filed after the third lineup. And the warrant was issued after the felony review was on the 7th at 11 p.m. Correct. The lineup was on the 6th. The lineup was on the 6th and 7th. He was arrested on the 6th. One lineup was conducted on the 6th. The second lineup was conducted on the 7th. His attorney arrived between the second and the third lineup and then left, and then the third lineup was conducted. And I believe a formal complaint was filed for finding a probable cause. So he was arrested, cuffed, taken to a station. He couldn't leave. He could not leave. It's important to note there's two different kinds of investigative alerts that are conducted by Chicago police. One is for investigatory purposes only. That involves an investigative alert that is not supported by some finding of probable cause. Essentially, they put an alert out for a witness or a victim that they haven't been able to locate for a while, somebody they want to talk to, but not necessarily somebody they are targeting as having been a person that is wanted for a particular crime. The second type is what's at issue in this case. It's an investigative alert for arrest specifically. And in issuing an investigative alert for arrest, the police department has formal proceedings, formal procedures that they follow. They have to have approval of a supervisor for an express finding of probable cause. And for that reason, that formalized proceeding, that's why we're arguing that it's akin to a filing of a complaint and the issuance of an arrest warrant. I'm going to the United States Supreme Court case of Rothschild v. Lee. Yes. Which is the leading case in which you cite, so does the state. You say that the question is at what point the government has committed itself to prosecution. That's the first part. Correct. Now here, that hasn't occurred yet, has it? Well, I would contend that it has because, again, the Supreme Court had noted and expressly rejected the notion that a prosecutor had to be involved in the issuance of or had to even know that an arrest had occurred. In Rothschild v. Lee, it was a Gerstein hearing situation. But here we have a situation where after the third lineup, if you recall the facts being, after that time there was a warrant issue. So here we do have that decision being made by the state's attorney's office at that time. So that's after the lineup. That's correct. But we're contending that the state's attorney doesn't, it's not necessary that the state's attorney be involved in the process for it to be deemed the commencement of an adversarial judicial proceeding. We're looking at the government's role and their, and the relationship between the government and the defendant. And when it becomes solidly adversarial, that's when adversarial judicial proceedings commence. If you assume that when the three witnesses came in for the in-person lineup, none of them were able to identify Mr. Starks, it's entirely possible the police would have let him go, right? That is true. However, before that, the police had already made him a target in this case, had already declared that probable cause had existed, and maybe down the road that probable cause would have dissipated. But that's the same as going for a complaint and having a complaint filed or a Gerstein hearing. It's the same as a Gerstein hearing. You approach the court, and if the court finds no probable cause, then that probable cause dissipates. But the court held that the Gerstein hearing was adversarial judicial proceedings that triggered attachment of the right to counsel. And, you know, there's really no detriment to the state in finding that the adversarial judicial proceedings commence at the issuance of an arrest warrant or an investigative alert for arrest. It really just set the clock back just maybe a day or two. It's already the right to counsel that the defendant would be receiving the following day after arraignment. He was in custody for 36 hours? He was. Do you know at what point he was given Miranda warnings? I believe he was given Miranda warnings right away. At his arrest? In the alley? I believe so. I believe so. And he was, I believe he was re-Mirandaized maybe one or two times as well. But again, his Fifth Amendment waiver of the right to counsel does not impact his Sixth Amendment right to counsel at the line now. I just wondered, I couldn't find the Miranda warnings in the package that I was looking at, and I just wanted to see if you knew. I believe so. I can double-check. And Rothgerry, we contend, the United States Supreme Court, since Kirby, has been expanding adversarial judicial proceedings. Initially at Brewer in 1977, the Supreme Court found that prior to Brewer, Kirby said that it has to be initiated by way of formal charge, preliminary hearing, indictment information, or arraignment. And in Brewer, the court held that arraignment on an arrest warrant was the commencement of adversarial judicial proceedings. But that's arraignment. Correct. Which involves a judge. Haven't the majority of the federal circuits rejected the notion that the issuance of an arrest warrant triggers the Sixth Amendment right to counsel? There is no case that holds that the issuance of an arrest warrant triggers Sixth Amendment right to counsel. But our position is that the definition is being broadened year after year, case after case. In Jackson, the Supreme Court said that the argument was the second arraignment counted, not the first arraignment. And the Supreme Court rejected that notion. And they looked again at the relationship. It's not just the filing of a formal document. It's not just the defendants being hauled into a formal court. It's the relationship between the government and the defendant and whether the relationship is solidly adversarial. And the court acknowledged that that can be so prior to indictment. And then again, in Roth Gary, the Supreme Court expanded a little bit more and said that a Gerstein hearing is an adversarial judicial proceeding. And that occurs after the defendant has been arrested without a warrant. Is there any additional arguments you can make under the Illinois Constitution, under Article I, Section 6, that differentiate? Is that any different or should that be interpreted any differently than the federal protections? Well, certainly under McCauley, Illinois law provides greater protections than the federal Constitution. And we would contend that McCauley allows this court to provide greater protections than the United States Supreme Court has so far acknowledged. And although they rejected the argument that adversarial judicial proceedings commenced, that again was pre-Roth Gary. And so we would ask that this court consider those same reasonings and apply them to the Sixth Amendment right to counsel. They expanded the Fifth Amendment right to counsel more so than the United States Supreme Court has allowed for. And for those same reasons, we ask that this court expand the Sixth Amendment right to counsel. Have any states done that? I could not find any case law on it, but there are almost a dozen states that have provided a statutory right or a criminal procedural rule that allows for the Sixth Amendment right to counsel upon detention. Which is not the situation here. There's no statute. Correct. Right. Again, we would ask that without considering an investigative alert to be the equivalent of an arrest warrant, it basically allows the state to make an end run around constitutional protections of an arrest warrant. And again, there's really no detriment to the state to allow the right to counsel at a lineup after a formalized finding of probable cause has been determined. If there are no additional questions on any of those issues, we ask that this court reverse Brandon Stark's conviction and remand for a new trial. Again, Your Honors, I'm Assistant State's Attorney Tasha Marie Kelly on behalf of the people. In light of the fact that counsel addressed only issues 2 and 4, I will also be responding only to 2 and 4 unless Your Honors have questions on the remaining issues. First, in regards to issue 2, which is the other crimes evidence, there's really 2 different parts to this issue. The first part being whether the exclusion of the guns was a part of the motion in Lemonet or the hearing on the motion in Lemonet and whether the terms of that motion in Lemonet were violated by the state. And second of all, whether the evidence regarding the additional 2 guns and ammunition was properly admitted. So turning first to the first part of the issue, which is the motion in Lemonet, our position is that the intent of the defense counsel was not to exclude the evidence of the additional guns. And this is clear from the actual filing that was presented to the court by counsel. That filing, by its terms, talked about the fact that the defendant was identified in police reports as possibly being involved in other alleged crimes, but he has never been found guilty of those offenses. That would not refer to the other guns which were found in the residence. There was no mention of defendant being in possession of those weapons in any police report, so clearly that was not a reference to it. Assuming we accept that, was there any proof at trial connecting this defendant to any of the other weapons? No, there was not. To the ammunition? No, there was not. Was there anything connecting the other weapons to the crime? The other- The crime being the murder? No. And nothing with regard to the ammunition as well? So there's no connection between those additional pictures. The one picture they showed the jury with just the gun that allegedly was used in this murder. Yes. The other pictures were of several weapons and ammunition that were being kept in this room in the apartment. Yes. No evidence provided at trial connecting it to the crime or to the defendant. Why is that not the reason for a new trial? Hasn't that then created a serious problem? Well, I would say for two reasons. First of all, the circumstances under which the testimony and the pictures came in from Officer McHenry and the other officers who testified, Officer McHenry described exactly what happened during the course of defendant's arrest and the following resulting search of this apartment building. But he wasn't connected to the apartment. In order to explain the circumstances of his arrest, one of the officers had to say was we apprehended him behind a particular building. He identified himself as Brandon Starks. We had an investigative alert for Brandon Starks, and he was arrested. The apartment, you know, didn't have any connection to him, did it? Well, first of all, the first detective testified we were working as a team. I went after a defendant. The other officer went up to clear this apartment. The officer testified during the course of clearing that apartment, this is what I saw. I walked in, and from seven to eight feet away, I saw three guns laying on the counter. Describe what he saw. Extended clips, ammunition. This was significant because this gun was discovered in plain view, so the officer clearly had to describe precisely what he saw in order to indicate to everyone how this gun was in plain view. Accordingly, the picture which was introduced was introduced to describe the recovery of the murder weapon. Well, what's the advantage of the picture? Isn't that prejudicial considering that the officers already testified how he saw the gun allegedly used in the crime? So why do we have to have a picture of what he saw? Well, I think that typically in a trial, when an officer describes a scene, then you show an officer a picture and say, is this the scene as it appeared that day, so that he can, in fact, identify what that was. I would point out that there is nothing in the record that definitively indicates that that exhibit was ever shown to the jury, that the jury ever saw the picture with all three weapons. It's not clear from the record what exhibits went back. And although a defendant indicates in his brief that we should assume that that picture went back to the jury, we actually, in fact, don't know that it ever did. Well, it was certainly argued to the jury by the state in its closing. Well, the fact that there was a drawer full of ammunition, it wasn't enough that he had a gun, he had to have extended clips. That was argued to the jury. However, the murder weapon, which was recovered in the apartment building, did have an extended clip. Granted, it was two months after the murder, but however, the murder weapon, which was recovered at the scene and which was talked about at the trial, did have an extended clip at the time that it was recovered. Well, when you say the scene, though, this is a building that he had no connection. The scene, he was arrested in an alley. Well, but when the officers approached the building on the unrelated investigatory alert, they found a defendant without shoes running out of the front door of the building, and then they chased him down to the alley. Well, then there's nothing that indicates he was actually in that apartment that day. And to talk about, at the trial, to talk about, especially in closing, the arsenal of weapons, nobody ever caught this defendant around, with, near, close to, connected to an arsenal of weapons. Well, I believe the arsenal of weapons comment was made by the court in sentencing and was not made by the state's attorney in the closing argument. I believe the comments that were made by the state's attorney in the closing argument had to do with the extended clips and the additional ammo that was necessary based on the extended clips. Nobody has connected this defendant to the additional guns, the additional clips, the extended clips, that apartment. He was running out of that building. He could have been anywhere in that building. We don't know. Yeah, and just to be clear, there was no argument, no testimony, and nothing to suggest that defendant was ever connected to those two additional guns. The only comments that were made connecting, potentially connecting defendant to anything, would be the extended clips and the additional ammunition in those extended clips. And, again, the murder weapon, which was recovered, which was connected to defendant through the DNA evidence, which could not exclude him, showed that that murder weapon did have an extended clip. Well, even so, it was two months between the time of the shooting and the time they found the gun with his DNA on it. He could have touched it at any time. That's correct. If there's something further on that issue, turning to the fourth issue, starting with a question that you raised, Justice Mason, as to whether there has ever been an Illinois Supreme Court case which has found that the issuance of a warrant for a murder weapon, an arrest warrant, triggers the Sixth Amendment right to counsel. There has not been an Illinois Supreme Court case which says that. However, there have been several Illinois Supreme Court cases which have said that the issuance of an arrest warrant does not trigger the Sixth Amendment right to counsel. Those cases are cited in our brief. They are People v. Wilson and People v. Garrett. And in both of those cases, which are very similar to the case before this court, the defendant argued that his Sixth Amendment right to counsel was triggered because there was an arrest warrant issued for him. He was taken into custody, and then he was placed in a lineup without being given the benefit of counsel. And in both of those cases, the Illinois Supreme Court said that the fact that he was placed in the lineup was not a violation of the Sixth Amendment right because that right had not yet been triggered because the mere issuance of that warrant was not enough to be characterized as the start of adversarial proceedings against him. Might the investigative alert, and in this case it was investigative alert, probable cause to arrest, is that correct? Yes. That's the name of it. And under the Illinois Constitution, Article I, Section 6, it says no warrant shall issue without probable cause supported by affidavit, particularly describing the place to be searched and the persons or things to be seized. Now, that being the case, if an investigative alert is the equivalent, as is argued, to a warrant, there's no affidavit. There's a finding of probable cause by the supervisory police officer, but there's no affidavit. There's no judge making that determination. It's the police department making that determination. And to me, I don't think that issue specifically has been addressed by an Illinois court. Well, I would say that there is a significant difference between an investigative alert and an arrest warrant. And certainly in the Highland case, in the dissent which was written by Justice Salone and joined in by Justice Navelle, they clearly laid out what they believed to be the significant differences between the two. Namely, part of which, as you're saying, it's an internal determination of probable cause. So why, under the Constitution, though, it says probable cause to arrest. That's what a warrant is. Correct. Okay. And under the Constitution, it says you need an affidavit. And there's no affidavit being prepared here. So why isn't this a violation of the Illinois Constitution, which is different than the U.S. Constitution? I'm not talking about the U.S. Constitution or federal law or anything else. I'm specifically addressing that aspect. It's not a violation of that because an investigative alert is not the equivalent of an arrest warrant. Because? Because for the differences that were expressed by this court in Highland, it's an internal mechanism that allows the police to make the determination that they are going to take this person into custody based on their internal finding of probable cause. But isn't that what a warrant is? You have a judge doing that exact – instead of a supervisory police officer, you have a judge doing it. Isn't that protecting the rights of citizens of Illinois when you have a judge doing it with an affidavit rather than have a police officer doing it? Where the Constitution doesn't say anything about a probable cause without an affidavit. It says it has to have an affidavit. And they're different and still the individual is being picked up the same as it would be under a warrant. That is not a difference. And certainly for a warrant, you're correct, there is the requirement of an affidavit, and while it may seem like a semantic difference, an investigative alert is different from a warrant. And what is laid out specifically in the Illinois Constitution is a warrant, and if we're going to get into terms of statutory interpretation, the plain language of the Illinois Constitution says warrant. But is a warrant – is an investigatory alert another name for a warrant? And there's many cases, as you know, of Supreme Court law and state law and constitutional interpretation where words have a lot of different definitions. What a warrant is and what an investigative alert probable cause to arrest is may or may not be the same. That's what you're saying. You're saying that – I'm saying that while the end result of the two may or may not be the same, there are differences, and what suffices for probable cause under an investigative warrant based on the internal determination by the police may not be the same as what the judiciary would have made as a finding for an arrest warrant. But the final result is the same, and that's the problem I'm having is that in the state of Illinois, rather than a judge making that determination, you have somebody in the police department making the same type of determination of probable cause, and the Constitution of Illinois says no. Well, to date, investigative alerts have never been found to be unconstitutional, and so it certainly, at the time that it was exercised in this case, was a valid exercise of the police's authority, and certainly I would argue that the language of the Illinois Constitution in and of itself does not preclude investigative alerts solely because there is not a judicial affidavit. Okay. The defense says it's an end run. The police had plenty of time to get an arrest warrant. They had this connection between his nickname and his name. That was the only reason they issued the investigative alert. Are you telling me that that wasn't enough for a warrant? That that was not enough for a warrant? No. I mean, why didn't they just get a warrant? If they wanted to arrest him, if they wanted to get the guy and hold him in custody, they had two months. Why didn't they just get an arrest warrant? Why didn't they go to a judge and show probable cause? The defense is saying this is an end run, and you're telling me that it's not, and I'm having trouble seeing how it isn't. Well, I can't speak as to the exact decision that was made by the officers as to why they chose to issue an investigative alert as opposed to an arrest warrant, but what I would say is that investigative alerts are something that are allowed for the police to do it. It's never been ruled that it's unconstitutional or a violation of a defendant's constitutional rights, and so with that being said, it was a valid choice for the officers to make. As to whether it may or may not have been better for them to have gotten an arrest warrant, I can't really answer that question. If we say that for constitutional purposes an investigative alert is the same as an arrest warrant, does that mean the Sixth Amendment right for this defendant attaches? No, absolutely not. I mean, the law is clear that the right is triggered by the initiation of adversarial judicial proceedings, and as I said, there have been at least two Illinois Supreme Court cases which have specifically said that the issuance of an arrest warrant is not enough to trigger that Sixth Amendment right. And I recognize that counsel's argument is that the Rothgary case has started the expansion of that, but if you look at the actual language of the Rothgary case, what the United States Supreme Court said is they're merely reaffirming what's been held before and what the overwhelming majority of jurisdictions had held, which is that the criminal's initial appearance before a judicial officer where he learns of the charges against him and his liberty is subject to restriction marks the start of adversarial judicial proceedings. So even if you're talking about the issuance of an arrest warrant, there's no defendant that appears before the judiciary. There's no charges at that point for the defendant to be advised of. There's no court appearance by the defendant. So certainly, even under the specific terms of the Rothgary case, that would not support the idea that an arrest warrant, the issuance of an arrest warrant in and of itself triggers the Sixth Amendment right. Can I go on to another topic? Sure. It seems, is the major evidence against this defendant was the eyewitnesses, the three eyewitnesses identifying him as being the shooter. Is that correct? You have the DNA, but that was not all that clear. This was – without this, the case wouldn't have been made. Certainly, that was the strongest evidence. Okay. So since that is the crux of this case, those three eyewitnesses are the crux of the case, why shouldn't the defendant be allowed in that case? This is the case that cries out for expert testimony. Courts around the country have allowed expert testimony with regard to eyewitnesses, and the research has shown, which is substantially discussed in their briefs, that a few seconds somebody can't really identify a stranger. Particularly in a situation where you're seeing a shooting, to be able to say, yes, this is the person who did it. So shouldn't they have that opportunity to have an expert witness in this case? Well, I would say, Your Honors, that first you need to look at why the defense indicated to the court that they wanted the expert witness. And what the defense indicated that they wanted to present as far as expert witness testimony was, was very limited. And that was that studies have shown that where there is a gun present, that there's increased stress, and that when there's increased stress, that that can affect the memory. And that's precisely what he proffered the expert testimony would be in his motion. The court indicated after the motion was actually filed, when the court was denying the motion, that it felt that that was the type of thing which was understood by the average juror, that expert testimony on that point would not be helpful. That that was something that should be determined by the jurors, by themselves, rather than the experts. I understand that, but the fact that this is the crux of the case, I mean, if there ever was a case, I can't think of a case that cries out for expert testimony more. What kind of case then would any court say, it would be fine to have this expert testimony? If this isn't the case, what are the facts? Tell me, when would it be appropriate, if ever? Are you saying it's never appropriate? Well, there were three eyewitnesses in this case. Certainly, if there was one eyewitness, only one eyewitness who maybe had a less certain identification or a briefer period of time of viewing the defendant, then it might be a closer case. But here we have three eyewitnesses, independent citizens, no demonstrated motive to lie, who make three identifications of this defendant. Yeah, but one of them, what Ms. Howard said, the shooter went so fast, you couldn't hardly see if he went through the court way or whatever. This all happened in seconds. And I'm sorry to interrupt. And she said that in terms of the defendant running away. But her testimony as to actually viewing the shooting was, I froze and I stood there, and I got a good look at him. That was her testimony as to her viewing of the shooting. Ron Draper testifies that while he was ducked down while the shooting actually took place, he stands up and he gets a clear view of the defendant straight across the street from him, walking towards him with a gun. The third witness testifies that he got a look at defendant as defendant was chasing our victim, Bobby Shine, down the street, sees him stand over Bobby Shine and fire several shots into him. And while that might have taken place in under a minute or a matter of seconds, whatever they testified to, none of them indicated that they were unsure of their identifications. None of them... I don't think they said that. I don't think it was ever asked about how certainly they... I'm saying none of them indicated that they... Again, it has a tremendous effect upon whether this particular individual is guilty or not. In this case, the expert testimony would not have assisted the jurors. The fact that high-stress situations can affect your memory is something that the average citizen, the average person, the average juror knows. It's not something... We add into the other fact, and that was a factor that counsel mentioned, no motive. We know that the defendant and the victim never knew each other, as far as we know. Well, we actually don't know that. We don't know, but as far as the evidence was that they didn't know each other, no motive was found, no connection between these individuals. So, and we have an anonymous phone call to the mother of a nickname, and there could be other people nicknamed this nickname. The police go through and they put... This is the guy, because he's got... His hair is the same as the identification. There could be thousands of people in the city of Chicago with that kind of hair. They may have nicknames that are on the police database that aren't. I mean, when you add on all the other factors, doesn't it cry out for some extra testimony? Well, just in response to a couple of things you said, we don't know, first of all, that there was no relationship between the two. There was no testimony about that, but we don't know that. As to the anonymous tip, the fact that the person chose to contact the mother of the victim with the information that they had, as opposed to coming forward to someone else, doesn't have anything to do with the validity of that tip. Maybe it does, because she was asking around, and if somebody wanted to get at somebody else, all you had to do is call the mother and say, hey, this is the guy. And they could never trace who made the phone call. Well, that is correct, but it's not like the police went out and arrested the defendant based solely on that tip. They found his nickname in the database. They generated the picture. They brought the witnesses in for photo arrays. He was identified by two of the three witnesses, and the third witness testified at trial. You know, I thought I recognized him, but I wanted to wait until I saw him live in person before I made an identification. And once he was arrested, he was again identified by all three witnesses. Okay, let's talk about the six picks, the photo arrays with the six pictures. The one that goes to Draper, there's two guys. There's a witness testimony. I think it was Mrs. Howard who said his dreadlocks were long and floppy when he was running away. I think it was Mrs. Howard who said that. So in the six picks, you've got the one to Draper, two guys with short dreadlocks, two guys with long dreadlocks, one sort of chubby guy, and one guy with real sort of scraggly dreadlocks. So they weren'tóthey didn't look alike. They weren't close. They weren't picked to be similar. They were clearly not similar. So there's a question about whether or not that was a suggestive six pick. The six pick that went to Howard I think was the same six pick, but it seems to me that when you get toó the lineupówell, the lineup was the hat. When you get to the lineups, there's even more disparity among the people who are in the lineups. I mean, you can't tell me that in the entire Chicago Police Department they can't find six guys who are African-American who have long dreadlocks for a lineup on any given day. I mean, it just sort of defies reason. So the lineup they give to probably rightóit was a little unclearó one guy has really short hair, one guy has really short dreadlocks, one guy has medium dreadlocks, and only the defendant is in this picture with long dreadlocks. In another lineupóin the other four lineups, you've got the same sort of disparity. So to me, the expert testimony and the sort of sparse eyewitness identification highlights Justice Hyman's point that the expert witness on the vagaries of eyewitness testimony was really important in this case because what they were being shown to identify fromó I think an argument has been made, and I think you could consider it seriously, that there were suggested six-packs and there were suggested lineups. And in that situation, in this particular case, Justice Wolfson has saidó and I think people versus Allenóon a case-by-case basis, the expert testimony on the believability of eyewitnesses has to be taken seriously. So my question is, again, isn't this a case that is more serious based on the inconsistency of the six-packs and the lineups? But then on top of that, you have the judge not taking it seriously, saying, oh, we're not going to do that, deny, deny. We're not going to do that. We're not going to listen to that. Well, you can put it in there, but it's nonsense. How can any reasonable person believe that the judge was taking that seriously? Well, I would say two things. And just to clarify one point, the defendant has not challenged the lineups or the photo arrays on this appeal. That's not an issue that was raised by the defendant before this court. But getting back to your question, to clarify what happened with the court's decision, the court was informed prior to the motion being filed that counsel's plan was to file a motion for expert testimony. And it was at that time that the court made the comments that you're referring to. I don't believe in that kind of testimony. But once the motion was actually filed, it's clear that the court did exactly what this court said the judge has to do in Walter Allen, which is to look at the testimony that the defense is asking to present, look at it in light of the facts of this case, and decide whether it would be of assistance to the jury, decide whether what the expert would testify to was within the ken of the average juror. And if you look at the court's actual ruling on the motion and his comments at the motion for a new trial, it's clear that notwithstanding his earlier comments that that's exactly what he did. He said, I looked at this testimony, I looked at it in light of the facts of the case, and I found that it wouldn't assist the jury, that this is something which is well within the understanding of the average juror. I read what you submitted to me, I read much of the documentation that you submitted to me, and I just don't think that it was appropriate for this case. I'll let you cross-examine these witnesses on the level of their stress, on their ability to observe, on whatever you want, but I'm not going to allow this testimony. And based on those comments and his representations of what he did, he fulfilled the requirements that were set out for him in People v. Allen. And as to the specifics of whether that ruling was right, expert testimony in this case would have been when there's a gun, people get stressed, and when people are stressed, sometimes it affects their memory. That kind of expert testimony is based on statistics. It would say that some people are affected when this happens, that stress can affect some people, that some people – it doesn't mean that these three witnesses were the people who would be affected by this. One witness, Mrs. Howard, says, I froze. Another witness says, I was ducked down, presumably, because he was frightened, which is normal when gunshots are being fired. So it's not just anybody out in the world. It's two of these witnesses that said, this was pretty scary to me. That's correct, and I am not in any way trying to indicate that these witnesses weren't scared. It's clear from the record that they were scared. But it's not clear from the record that that affected their memory. Well, but just in Perry v. New Hampshire, Justice Sotomayor – and I was in a dissent – but she said that the single greatest cause of wrongful convictions in this country is eyewitness misidentification. But then she went on to say, the study after study demonstrates that eyewitness recollections are highly susceptible to distortion by social cues and post-event information. And this is the important part to what you just said. Quoting Justice Sotomayor, jurors routinely overestimate the accuracy of eyewitness identifications. Jurors place the greatest weight on eyewitness confidence in assessing identifications, even though confidence is a poor gauge of accuracy, and that suggestiveness can stem from sources beyond police-orchestrated procedures. It seems to me that is exactly why, in this case, it would be an abuse of discretion for the court not to consider. But here, even if we take away his comments at the beginning, even after he looked at everything, he didn't grant it. The question to us is, is that an abuse of discretion? And again, looking at that, it seems that it would be difficult to say that it's not. And while I hate to quibble with Justice Sotomayor... You can quibble with her. She's not here. You know, basically what she's talking about is the jurors' determination of credibility, how much weight the jury is entitled to give these eyewitness identifications. And certainly, it's well settled that issues of credibility and the determinations of credibility and the weight to be given testimony in this state is the exclusive province of the jury. And while she may think that jurors give too much weight to certain testimony, such as eyewitness identifications, it's their province. It's their right. They are the charter of fact, and we have to have faith in them as jurors. The Illinois Supreme Court has said in People v. Ilgin, Faith in the jury to sort through the issues, give proper weight to the evidence, is the cornerstone of our jury system. So if there's nothing further, for those reasons and for those stated in the People's Brief, we would ask you to affirm the defendant's sentence and conviction in this case. Thank you very much. I just wanted to address the expert witness issue since I did not argue it in my opening. This is the exact case that Alan supports a finding of the admission of this kind of evidence. The state contends that it's not clear from the record that the witness's fear affected their ability to observe. That's exactly why this kind of evidence should have come in. It's not the average knowledge of the average person, within the average knowledge of the average person, how exactly the observance of a violent exchange of a firearm, a violent death, would affect a person's ability to observe. And in this case, there are several inconsistencies. Not only are their descriptions of the shooter minimal, their opportunity to observe is a matter of seconds, but there were some inconsistencies about the witness's story that goes to show that the impact of this violence could have really affected their ability to see what they claim to have saw. The finding that you want us to make on this appeal is that it was an abuse of discretion for the trial court not to give serious consideration to the expert testimony proffered by defense counsel, not that we should direct the trial court what to do on remand. Well, our argument is kind of twofold. First, that the court didn't actually properly address the request to introduce this evidence, had already made a foregone conclusion that this evidence was not going to come in before the motion was even filed. And under Allen, the judge did not adequately consider the weight of this evidence and how it would have helped the jury. And the other part of our argument is that even if the court, after the fact, considered the motion that it was an abuse of discretion under the particular circumstances of this case, because as this court noted, the eyewitness testimony here was basically the main part of the state's case against Brandon Starks. And there's no better case to introduce this kind of evidence than this case. In response to the state's, it's true that on appeal we did not challenge the trial court's ruling on the motion to exclude the lineup and photo array identifications as a separate issue, but we did in fact argue in our reasonable doubt argument and in our prejudice argument that the suggestiveness of the array and the lineup do go to the weight of the evidence against Brandon Starks and that those identifications are actually pretty weak, given the suggestiveness. And that's one of the male versus female factors that this court could consider. And I just also wanted to clarify about whether the photographs of the weapons went back to the jury. The photographs are not explicitly listed. None of the exhibits that went back to the jury were explicitly listed in the record. However, the state entered all of its exhibits into evidence. The pictures were marked as people's exhibits, number, such and such. And the court gave both parties the opportunity to object to sending any of the exhibits back to the jury, and no objection was made. So I think it could be a proper conclusion that the exhibits did go back to the jury. And finally, just again with the other crimes evidence, the state says that defense counsel did not specifically ask that these guns be excluded. And my question is why not? The defense attorney explicitly said that the narcotics found in the exact same apartment should be excluded. Why wouldn't a reasonable attorney would certainly ask for the same kind of exclusion in terms of all these weapons evidence? And it was easy for the state to isolate the narcotics evidence and allow photographs of the apartment in which the murder weapon was found without reference or showing the narcotics that were found. They could have easily done the same thing for the firearms evidence. Again, for these reasons we ask that this court reverse Mr. Stark's conviction and in the alternative reverse and remand for a new trial. Thank you very much. I'd like to thank Ms. Rubio for the argument on the state appellate defender's behalf and Ms. Kelly from the Cook County State's Attorney's Office. You both did an excellent job and did your offices proud. And I appreciate you taking as much time as you did on this difficult case which we now take under advisement. Thank you very much. All rise.